We'll hear argument next in Case 15-446, Cuozzo Speed Technologies v. Lee. Mr. Beeney. Mr. Chief Justice, and may it please the Court, I'd like to begin this morning with why the use of the broadest reasonable interpretation expedient in no way comports with the congressional purpose of inter partes review, and then address why the Board's ultra-virus determination in instituting inter partes review is subject to judicial review. Consistent with history, Congress left to the judiciary to determine construction standards, and therefore, in the American Invents Act, there is no explicit statutory language directing the Patent and Trademark Office to use any particular standard of claim construction. But this Court should reverse as a matter of statutory construction for four reasons. First, in summary, all agree that the broadest reasonable interpretation expedient demands a broad ability to amend claims. And that's so because the broadest reasonable interpretation brings into play a broader array of prior art that may be distinguishable if the claims were given their actual interpretation. In established inter partes review, Congress sought to substitute and provide a district court-like litigation for the determination of patentability, and therefore, did not provide the wide liberty to amend claims. Sotomayor, I might be moved by your argument if Congress had not given any right for the Board to amend, because that would be consistent with practices in the district court, where district court can't amend under any circumstance. But basically, Congress here said you can amend once. I'm not sure that that supports your proposition. Katyala, I think there's a distinction between allowing a party to make a motion to amend and the absolute right to amend even once. And Congress did not provide any right to amend in inter partes review. It provided only an extremely limited ability to seek to amend. And in fact, in practice, that opportunity to seek to amend is almost always denied. And it is denied, consistent with congressional intent of establishing inter partes review to be a court-like adjudication. So simply as a matter of numbers, the Board has denied 95 percent of the motions to amend. In 42 months of inter partes review, the Board has allowed five motions to amend and allowed for less than 30 claims to be amended while canceling 10,000 claims. What's the second of your four? The second reason why, Your Honor, the result below should be reversed is because the Congress in establishing inter partes review intended inter partes review to adjudicate property rights. And in doing so, it makes no sense to attribute to those property rights a hypothetical interpretation of their meets and bounds, rather than doing what district courts do, which is to give claims their actual, plain and ordinary meaning. The third reason, Your Honor, why this Court should reverse and have the Patent and Trademark Office use the ordinary claim construction matter is because there are a number of anomalies that injure the patent system and injure patentees that stem directly from the use of inter partes review. Those include a claim meaning different things in the courts and before the Board. Those include different results in the courts and the Board as to whether a patentee's property rights are taken away. And those include claims meaning one thing for patentability in the Board, but a wholly different thing for infringement in the district courts. That's simply untenable, and there's no reason to suspect that that was anywhere within Congress's intent in enacting inter partes review. Finally, this Court should reverse because the government really has not in any way offered a support of using the broadest reasonable interpretation that is in any way tethered to inter partes review. It simply says, historically, we've done this before and so we should be permitted to do it again. Strikingly missing from the government's position, however, is really any objection to taking the district court's substitute that Congress enacted and using the claim construction that the district courts do, the ordinary meaning of the claim terms. There's nothing really in the government's brief that suggests that it would be inappropriate to use that claim construction, and that's the claim construction that should be used. Alito, so is the standard of proof for invalidity the same in an infringement action in district court as it is in inter partes review? It is not, Justice Alito, and I think the reason there was a sensible reason behind it in that Congress tweaked the court-like adjudicatory system and recognized that it was establishing a board of experts, and therefore there was no reason to have the presumption in favor of patentability that we find in the district courts. But that in no way suggests that the Congress, in enacting inter partes review, was suggesting that there be a different claim construction standard that are used in the district courts when inter partes review was to be a substitute for district court litigation. If I may, Your Honors, I would like to delve into the question that Justice Sotomayor asked about the amendment process. I think it's important to recognize, as the Patent and Trademark Office repeatedly has before its merits brief in this case, the profound distinction between the permitting a party to make a motion to amend in an adjudicatory context and the absolute right to amend in the examinational context. And in fact, the PTO, as it participated in the Microsoft v. Proxicon case, submitted a letter to the Federal Circuit making exactly this point in April 27, 2015. What the PTO said to the Court was that, in fact, there is this very profound distinction between the right to make a motion to amend in an adjudicatory context and the ability to amend patents in the examinational context, where there is an iterative back-and-forth, generally cooperative process between the examiner and the patentee. That is diametrically different to the system that Congress established in inter partes review, as the Patent and Trademark Office represented to the district court. And going back to the statistics that I was citing in response to Justice Sotomayor's original question, 95 percent of the motions to amend in inter partes review are denied. Less than 30 claims have been amended, while 10,000 have been canceled. And there is simply not the kind of ability that is necessary in order to avoid the prejudice to the patentee of giving her claims a construction broader than what they actually are that's afforded in inter partes review. Alitoso, do the Board's institution decisions always set out what it understands the broadest reasonable interpretation to be? And if they do, is it – must the Board stick with that throughout the proceeding? And if that is true, why does the patent holder need more than one opportunity to amend? The IPR proceeds in two separate stages, as your question implicates, Justice Alito. First, there is the institution decision. In there, the Board typically does set forth a preliminary claim interpretation standard. But for the government to take the position that that's the end of the ballgame is wholly inconsistent with its position on the second question presented about appeal. Obviously, the claim construction interpretation is subject to appeal, and so it can't be fixed in the institution determination. The final claim construction standard that the Board applies to make the ultimate decision as to whether the patent is going to survive is in the final decision that the Board renders. At that point in time, it's too late for the patentee to make any kind of determination as to whether it would like to amend and cancel the claims that are under review. I also think it's important to distinguish the examinational context in which historically BRI has been cabined to. Historically, in fact, what's used in the court-like litigation structure that Congress established in Inter Partes Review is the ordinary meaning standard. But in addition to the fact that one really can't do it. Ginsburg-Miller, I mean, suppose you're right and it should be ordinary meaning. That doesn't determine who's going to win or lose this case, does it? What would happen, Your Honor, if the Court agrees with us that the Board should be using the ordinary meaning test is that the case should be remanded to the Board to give Quozo's claims their appropriate construction? That's never happened in this proceeding. That would be the result of Your Honor's agreeing with us. And we believe that once we go back to the Board and the Board applies the appropriate construction to our claims, our claims will survive review or at a minimum we will be permitted to amend, because the basis of the decision by the Board to deny Quozo the opportunity to amend was that the claim construction read out of the construction of the claims an embodiment that's set forth in the specification. Under the ordinary meaning standard that the Board should be applying in this adjudicatory context that Congress set up to litigate over substantive property rights, the Board would be applying the ordinary construction standard, which we believe would include the embodiment that's in the specification, and therefore we would receive relief. Kennedy, if the patent is invalid under its broadest reasonable interpretation, doesn't that mean the PTO should never have issued the patent in the first place? And doesn't that give very significant meaning and structure to this process? Not necessarily, Justice Kennedy. And the reason is this. The purpose of the broadest reasonable interpretation, expedient, as the government agrees it is, it is not a claim construction standard, as the Federal Circuit said in Skaborchik. What it does is try to test for ambiguity in the claim language, not patentability. Patentability is the standard that Congress set in Inter Partes Review. But what the broadest reasonable interpretation does is try to test for ambiguity in the patent language. So it can be amended. So the fact that a patented invention or an application may not pass the broadest reasonable expedient does not mean that the inventor has not claimed a patentable invention. It simply means that the language is ambiguous and the language needs to be refined. And that is a wholly different exercise. Kennedy, I guess I was thinking of the mindset, the process, the structure that the PTO uses in the first place. It looks at a claim. If I were the examiner to determine whether or not I should grant the patent, I would say I'm going to give this the broadest interpretation to make sure I'm right. It seems to me, or am I wrong, that that's not what they do? They do, but not to determine whether the claims are patentable. They do to determine whether there's ambiguity in the language. And, Your Honor, you can go back to a whole line of district court cases from all the way from Carr in, I think, 1924 in the D.C. Circuit to the 2016 decision in PCC Broadband and all the cases in between, Savorczyk and In re Hyatt and all the other ones. The purpose of the broadest reasonable interpretation expedient, and it's called an expedient for a reason, is to determine whether claim language has ambiguity in it. If it does, then the patent owner can amend and does so as of right in examinational context, not in the IPR context. The patent owner can amend to clarify that her claims really don't mean what they may broadly be construed to mean. Breyer. But the question that Justice Kennedy asked, and I think it's an important one, to me anyway, was if you forget this proceeding, if in fact in the broadest possible or whatever reasonable interpretation, and you were in front of the patent office, and that's what they would look at, and if it was too broad, because that broad, it's, you know, has flaws in it of whatever kind, the patent doesn't issue, is that right or not right? If it's either right or wrong, you can tell me I'm right or you can tell me I'm wrong. There is an iterative process with the right to amend. I know that. I know that. I'm saying if at the end of the day, on the broadest reasonable interpretation, it is not patentable, there is no patent issued. That's correct. Breyer. Now, if that's so, you could look at this new law, as you were looking at it, as trying to build a little court proceeding. If I thought it was just doing that, I would say you were right. But there is another way to look at it. And the other way to look at it, and that's what I would like your comment about, is that there are these things, for better words, let's call them patent trolls, and that the patent office has been issuing billions of patents that shouldn't have been issued. I overstate, but only some. And what happens is some person in business gets this piece of paper and looks at it and says, oh, my God, I can't go ahead with my invention. And so what we're trying to do with this process is to tell the office, you've been doing too much too fast, go back and let people who are hurt by this come in and get rid of those patents that shouldn't have been issued. Now, we will give you again once the same chance we gave you before, and that is you can amend it once if you convince the judge you should have done it before. But if, on the broadest possible interpretation, you know, reasonable interpretation, it shouldn't have been issued, we're canceling it. And that is for the benefit of those people who were suffering from too many patents that shouldn't have been issued in the first place. I don't know. If it's that second purpose, then I would think, well, maybe this is right, what they're doing. And if it's ambiguous between those two purposes, I would begin to think, well, maybe they should have the power themselves under Chevron, Mead, or whatever, to decide which to do. All right. Now, that's the argument I think that's in my mind registering the other way. So what do you say? Fisherman, just prior, if I agreed, and respectfully I'd like to explain why I disagreed. But even if I did agree, I would say that Congress in fact established exactly what Your Honor described. But it established a system in which we are adjudicating property rights. And it makes no more sense to adjudicate those property rights in a court-like setting by pretending that those rights are not what in fact was granted, what the patentee claims, or what the patentee could assert in district court infringement litigation, than it does to when you're in trying to determine whether someone's a patentee or not. Now, that's a different analogy for the obvious misanticipation tests. We look at what the boundaries, the meats and browns of that property actually is. So Congress, assuming that it did what Your Honor suggested, established a system to do that. But it established a system to adjudicate in a court-like setting the actual patent rights that a patentee obtains, not ones that someone suggests might be broader. That is to determine ambiguity in claim language, not to adjudicate rights. Sotomayor, if language is ambiguous, it can't have that plain meaning, can it? How would you have a plain meaning that a district court would apply if language is ambiguous? How could it say that you have a valid property right in something that's ambiguous? The test of the ordinary meaning, as enunciated by Phillips and its progeny, will first look at the claim language. If there's ambiguity in the claim language, then what is the meaning of that patent will be determined in light of the specification, the prosecution history, and other intrinsic evidence. In the rare case where there still may be ambiguity, then the court may consider extrinsic evidence, dictionaries, other writings by the patentee, what somebody of ordinary skill in the art might determine a particular claim limitation to mean. So there are a number of tools in the ordinary meaning construction standard that should be used here to do that. Sotomayor, aren't those tools used in determining the broadest, the broadest reasonable reading, meaning how can the PTO decide what a broad reasonable reading is unless it looks at all of those factors and decides that the specifications and all the other things don't cure, continue to provide ambiguity in the patent? It does not. The broadest reasonable interpretation is considerably different than the ordinary meaning construction standard. And in fact, the Patent and Trademark Office has admitted as much. In the Manual for Patent Examination Procedures, the Patent and Trademark Office tells its patent examiners, we, quote, do not interpret claims in the same manners as the courts. Just recently, a very important tool that courts look at in the ordinary meaning context, the prosecution history, in the Federal Register, the Patent and Trademark Office said that the only time it looks at prosecution history is when it is actually raised by the parties, relied on by the parties, and explained by the parties. There are very different sub-tools, if you will, within broadest reasonable interpretation and ordinary meaning, and that's because they intend to accomplish different purposes. One adjudicates patentability, which is what Congress intended in IPR. The other identifies ambiguity in claim language. In fact, if one looks at the Manual in Section 2111, the PTO tells its examiners that one of the reasons we use the broadest reasonable interpretation is because, unlike the courts, we don't have before us a fully developed prosecution history. Well, when you're in inter partes review, you do have a fully developed prosecution history, and that's what we should be looking at. Roberts, how does the relationship between the district court infringement action and the proceeding before the board actually work out in practice? If you're suing someone, here's my patent, you're infringing it, and the infringer goes to the board and says, I want you to determine the validity of the patent, and the district court is doing the same thing, or at least determining the scope of the patent in terms of whether or not it infringes? What typically happens, Mr. Chief Justice, is in those situations where a patent is not subjected to inter partes review, and I file an infringement case, is that the defendant may then seek to file a petition before the board seeking review of the patent and seek a stay in the district court. And, in fact, in this rather substantial transfer of the adjudicatory function from the judiciary to the administrative agency, we find that about 85 percent of patents that are being adjudicated by the board are subject to district court litigation. And in those 85 percent of the time, district courts are entering stays 70 percent of the time. So, in fact, what is happening is the judiciary is deferring to the board in making decisions about the patentability of the claims that are at issue. Roberts. I would think that's a little burdensome to the district court. They sort of have to get deeply into the patent case and then take whatever the board says is the proper, whether it's valid or not. Well, that, in fact, what happens is that should a claim survive inter partes review, then there are various estoppel provisions that Congress enacted in the American Vence Act that prevent the relitigation of the identical prior art that may have been adjudicated by the board in IPR. So the district courts don't need to revisit what happened in inter partes review, which is yet another example of why Congress intended inter partes review to be a substitute for district court litigation. In the district court, please correct me if I'm wrong, does the district court have the obligation to interpret the statute in a way that preserves the patent's validity? Only, as I was going through that litany of steps with Justice Sotomayor, only when the claims are ambiguous, we go to the intrinsic evidence. If that's ambiguous, we go to the extrinsic evidence. And then if really you have to. Kennedy, I would not think that in the IPR that that rule would prevail. In inter partes review, there is no presumption of validity. Congress recognized. But that shows a difference in these proceedings. There no doubt is a difference in the proceeding. But the fact that Congress recognized the expertise of this newly created board that it was establishing and thereby removed the presumption because of the expertise in no way suggests that in adjudicating patentability, the board in IPR should be dispensing with all the guidance that this Court has provided and all the guidance that other courts have provided in giving patent rights, in adjudicating whether they are patentable, their ordinary meaning. Kagan, it just simply doesn't flow. Kagan, is your argument, Mr. Beeney, that Congress couldn't have thought anything else except that the ordinary meaning standard would control? Because if I look at the statute, I mean, it just doesn't say one way or the other. So we're a little bit reading tea leaves, aren't we? Beeney, I think not, Justice Kagan. And I think your first sentence is perhaps really only at the margin of exaggeration of our position. And it is because of this. Take one factor that Congress enacted in IPR, a 12-month period from which the time must reach its final decision absent good cause. Contrast that with the examination proceedings. The examinational context and the reexaminational context take two to three years. Why do they take two or three years? They take two to three years because this is iterative, back and forth, looking for prior art, discussing with the patentee what did she invent, asking her to amend her claims if they are deemed to be ambiguous or too broad. That doesn't happen in inter partes review. It can't happen because of the time frame that Congress legislated. There are other reasons why.  Kagan. Kagan. I guess if I'm trying to put myself in Congress's position, I'm looking at the PTO and it does pretty much everything by this broadest construction standard. And if I had the clear intent that you're suggesting, given the backdrop of how the PTO generally operates, wouldn't I say so? I think not, Justice Kagan, for the historical reason that Congress has never addressed claim construction issues. It's always been a matter left to the judiciary, number one. And number two, the process that Congress enacted in IPR is a brand-new adjudicatory proceeding, unlike the PTO has ever confronted in the past. I mean, arguing that one in inter partes review should use the broadest reasonable interpretation is really the quintessential example of trying to pound a square peg into a round hole simply because that peg used to fit a very different hole. Congress established a very different proceeding in inter partes review. It is court-like. It is done under very similar circumstances to the way a case proceeds in the district court. It adjudicates actual property rights and takes those property rights away. And for all those reasons, if I may say, the statute basically reeks that the ordinary meaning construction standard used by the district court should be used. Ginsburg-Mills, Jr. Well, it's kind of a hybrid. It has, in certain respects, it resembles administrative proceedings and other district court proceedings. So there is a right to amend or an opportunity, an opportunity to amend before the agency, there isn't in court. There are discovery differences, there are other differences. So it's a little of one and a little of the other, this inter partes review. I think, Justice Ginsburg, there are differences, but none of them go to the fundamental fact of the claim construction standard. The system that Congress established is consistent only with ordinary meaning. And if you look again at this ability to amend, in fact, in examinational proceedings, patent applications are almost always amended. In reexamination, they are amended 66 percent of the time. In inter partes review, they are amended less than one-half of 1 percent of the time. And that is why the claim construction standard should be the ordinary meaning. If I may, Your Honors, I would like to just very briefly turn to the issue of appellate review of the Board's institution decision when the Board exceeds a statutory authority. Just very briefly, our position is that under the heavy presumption of judicial review of administrative actions, there is nothing in the statutory scheme that meets the heavy burden to overcome that presumption. The statutory scheme here can be read either, as the government would like to read it, to bar review forever, but then that provision has to be limited to its terms, that what is barred is the director's decision to institute under that section, as the statute says, not all the other criteria used in determining whether to institute review. But a better reading, as established by the Federal Circuit in Versada and the government's original position in Versada, is that the statute only prevents interim interlocutory review of the institution decision at the time. Under Mock Mining, under Bowen, this Court ought to find that the statute can be read to permit review, and it should. And if there are no further questions I would like to reserve, I remain. Ginsburg. I have just one question about that. Then the statute is doing no work because there would be a bar on interlocutory review under the Final Judgment Rule in any event. You don't need a statute to preclude interlocutory review when the reviewing court can review only Final Judgments. Correct, Justice Ginsburg, but what the statute does do that the Administrative Procedures Act does not do is, number one, bars appeal forever of decisions not to institute. Because those decisions will never become part of the final decision which you can appeal under a separate statutory scheme under the American Invents Act, the statute does that work. And the statute also does the work of barring interlocutory petitions for mandamus. Roberts. Thank you, counsel. Thank you. Mr. Gannon. Mr. Chief Justice, and may it please the Court. The PTO has reasonably decided to use its longstanding broadest reasonable construction approach in inter partes review proceedings because, as Justice Ginsburg just noted, that they are a hybrid between they're not exactly like anything that has gone before, but the PTO reasonably concluded that they are materially more like all of the other proceedings that the PTO and before that the Patent Office has had, in which it has repeatedly used precisely this approach, and it has expressly used it when it is possible for claim amendments to be made because it promotes the improvement of patent quality that Congress was interested in promoting in the America Invents Act by eliminating overly broad claims. Sotomayor, I'm sorry. Mr. Gannon, I'm a little bit confused. You bring a patent, you go into the reexamination back and forth with the Patent Office giving it the broadest reasonable interpretation, and you make amendments until you get to the point where the Patent Office thinks that whatever you have is clear enough to get a patent, correct? Gannon, clear enough and also satisfies the requirements of patentability. All right. So how different at the end of that process is the ordinary meaning from a continuing broad meaning? You've already had all these chances to amend, to make things as precise and as narrow as the Patent Office thinks it needs to be. Well, I do think that it is the case that in most circumstances, these two different forms of construction are going to end up in the same place. That's true in most of the case law. The Dall'Amicus brief supporting us explains this in particular. All right. So when doesn't it end up in the same place? It doesn't end up in the same place. Basically, when you get to the very end and the Court has to apply the presumption of validity that Justice Kennedy was discussing before that requires the Court to adopt a saving construction of a patent, it gets to the end of the process in both procedures, in the broadest reasonable interpretation and in the Phillips standard. They're going to start with the language of the claim in light of the specification as it would be understood by a person of ordinary skill in the art. It's true in the initial examination context that the PTO does not use prosecution history, but it is expressly noted that it will use prosecution history in a proceeding like this, the IPR, because it's already in existence. And my friend noted that it will only consider prosecution history that's briefed by the parties in the IPR. But the same thing is, of course, true in a district court proceeding. The district court is going to consider prosecution history that's introduced to it before the parties. And so at the end of the analysis, if a court or the PTO are left with two different potentially reasonable readings of a patent claim, a court has to adopt the saving construction. And the one in the concern is one about obviousness or anticipation in light of prior art, that's probably going to be the narrower construction. The board and the PTO, by contrast, and before that the Patent Office, have recognized that if you have a claim that could reasonably be read, this isn't just a hypothetical reading, but this is one, when you take all of this into account, that could reasonably be read as reading on a prior patent or as being obvious in light of a prior patent, then that's a circumstance in which the board's going to say, you need to make this clear. Otherwise, we're going to hold that it's not patentable. And that's exactly what's happening in the motions to amend that are happening before the board in IPR proceedings right now. My friend is correct in saying that the vast majority of motions to amend in IPRs have thus far been denied. Only about 13 percent of patent holders in IPRs have actually filed motions to amend, and there have now been six motions to amend that are granted. There was one new one last week. It's a small number, but the vast majority of these amendments are being denied on grounds of unpatentability. And this is a reason that actually isn't that different from what would happen in the initial exam or in the re-exam. And so my friend quotes Section 305, which is the standard allowing for a patent to propose amendments in a course of an ex partis re-examination. But note that it's the ability to propose amendments. That's not an amendment as of right. Just because you propose an amendment in a re-examination doesn't mean that the PTO at the end of that is going to say, that's right, this is patentable as you have proposed the amendment. It still has to find that, as amended, it does not read on the prior art. And what's happening here is the PTO is denying motions because even with the amendment, they would read on prior art and be unpatentable. Roberts. I think, as Justice Ginsburg described, that we're dealing with a hybrid entity with characteristics of the PTO and the district court. But it seems to me perfectly clear that Congress meant for this entity to substitute for the judicial action. So why should we be so wedded to the way they do business in the PTO with respect  to the PTO procedures? It's supposed to take the place of district court procedures. It's supposed to take the place to some extent, but not to the ultimate extent. It's not supposed to perfectly replicate the results of district court litigation. And we know that because Congress has imposed structural differences on the IPR proceeding that would guarantee that there could be different results at the end of the day. Most importantly, there's the different burden of proof. If you even though you're arguing about invalidity, in the district court proceeding, you're going to have to prove invalidity by clearing convincing evidence under this Court's topic. Roberts, we shouldn't accept as far as the number or broadest different procedures as we can. It's a very extraordinary animal in legal culture to have two different proceedings addressing the same question that lead to different results. That's true, Mr. Chief Justice, but they can lead to different results here for multiple reasons, even setting aside the question of whether the broadest reasonable interpretation applies. Well, you're just saying that, okay, there's a problem here, and so we should accept another problem that's presented where we don't have to do it. Well, we do think that the reason why this ultimately ends up being more like a board proceeding or a PTO proceeding is because there's the ability to make claim amendments. You're not, at the end of the process, just stuck with having to adopt a saving construction of the patent. The patent owner can come in and say, look, I can fix that problem. I can keep this from being obvious. And let's have a minor procedure. What are you saying, in the IPR proceedings? In the IPR, that's something that can be fixed. Well, that's happened six times ever. It's the – out of, yes, it's a small number so far. Many more motions, actually three times as many motions, 16 motions have been denied as moot. They were contingent amendments where the patent owner said, well, if you're going to adopt, if you're going to disagree with my claim construction, I would propose amending the patent this way. And the board said, we deny your motion as moot because we agree with your construction that the patent is actually patentable without the amendment. And this is not an instance where the patent owner is shooting in the dark, where he has only one chance to amend. As was already mentioned, the PTO, the board, is generally going to give a preliminary claim construction when it issues its decision to institute the proceedings. Here, at pages 171 to 177a of the Petition Appendix, there's seven pages of the board explaining in its decision to institute this proceeding what it thinks the phrase integrally attached means for purposes of this patent. Roberts, there's already been a case where you've had contrary results with respect to the same patent, right? In the same, in other words, parallel litigation, one says A and the other says not A. Yes, that can happen. Well, what do you do in that case? Well, in that case, if the patent has been invalidated by the PTO, then the district court litigation is going to abate. If the, if the. Roberts, so you put the district court to all the trouble? I mean, we're talking about district courts that don't do patent cases on a regular basis. You put the district court to all the trouble of trying to construe the patent, and then the defendant comes in and says, well, guess what, I won before the IP review, and so, sorry, but all that was wasted energy. Well, I think this is the reason why the most district court proceedings have been stayed while pending a parallel IPR proceeding before the board, and there are time limits on the ability. Congress expressly addressed this in Section 315, where it talked about, about the inability of somebody who's already brought a district court suit alleging invalidity of a patent to bring an IPR proceeding or somebody who's in privity with such a person. And there's a time limit that if somebody, if you've been sued for infringement by the patent owner in district court, then you have to start one of these IPR proceedings within 12 months. And so usually the district court hasn't gotten that far along, and there isn't that much wasted effort. And instead, what we do is we go back to the PTO, and the PTO gets exactly the chance that Congress expected it to have to say, is this one of those patents that we really oughtn't to have issued in the first place? Kennedy, is there a difference in the board proceeding, the IPR, and the district court litigation in this respect? For district court litigation, we're very concerned because of Article 3, and we have to have a specific controversy, specific injury, and so forth, but that an IPR proceeding can be more speculative in that the board and the parties can say, this could be interpreted in the future in a particular way. Is that – is there a difference to the tone or the thrust of the inquiries in the two instances? Well, I think that ultimately the question in the IPR is narrow because it's only devoted to a couple types of unpatentability, and it's going to be about whether the PTO ever should have issued this patent because it was, in fact, anticipated by a prior patent or it was obvious in light of prior art. Well, you say it's narrow, but we have the broadest possible construction. I'll work with that. I think you're probably right. But what I mean by narrower is that in a district court proceeding, there are other grounds that could be used to challenge the patents, and it could proceed along different lines. This is a narrower track in which the only grounds that can be considered are going to be invalidity on the basis of 102 or 103, and it is true that you do not have to be somebody who would have Article III standing in order to initiate an IPR. That's another thing that we think shows that this wasn't intended to be just a perfect substitute for district court litigation. To be sure, most of these IPRs are going to be instituted by parties who do have a competitive interest, who are concerned about whether they are going to be sued for infringement on the basis of this patent or – and therefore they want to make sure that this patent that they think ought not to have been issued is invalidated. Breyer, what's the evidence that is to say, I picked that up from your brief, that this statute is in part, call it a partial Groundhog Day statute. You'll do it again until you get it right. And partly it's designed here to go back to the patent office, probably because a large number of businessmen told Congress that they were getting threats of suits in respect to patents that obviously should never have been issued. Now, if that was the problem, then it doesn't make – it does make sense to say at least the PTO has the authority under a partial Groundhog Day statute to do that part of it over. And it's not surprising there were only six that actually got amended because they narrowed it before and because the PTO held these are invalid anyway. Okay? That isn't – so that doesn't move me. But look at the view I just expressed of the statute. There's another view, that this is just a little district court proceeding designed to save people that time and money that they'd have to spend on a big district court proceeding. All right? Now, what's the evidence that the first view that I had, which would not say this is just a little district court proceeding, is correct? Well, I think we have two different types of evidence. We do have the legislative history that we quote in our brief that said, the committee report said, that a purpose of this was to improve patent quality and help justify the presumption in favor of validity that accompanies issued patents in district courts. But then in terms of the notion that it's not just intended to be another little district court proceeding that happens to be faster and cheaper, is all of the structural differences that Congress imported here to ensure that it wasn't going to be exactly the same. And so as I mentioned, it was going to be limited to certain particular grounds of unpatentability under 102 and 103. The evidence that could be considered there is limited. The only prior art that can be considered is prior art that comes in patents and prior publications. And that's a narrower universe than could be used in a district court proceeding. And of course, the burden of proof is going to be different. And so we think that in speaking to all of those things expressly, and then also in ensuring that there still would be an opportunity to amend claims, that ultimately is the reason why this is not sufficiently like district court litigation for the PTO to depart from its longstanding practice of using the BRI approach in every type of proceeding, including post-grant proceedings. This isn't the first Groundhog Day type statute that the PTO has had. Roberts, is there what is the district court free to disagree with the PTO reading of the patent? But it's a fine, this is a pertinent fact, a mixed question of law and fact in litigation pending before me. And I appreciate the fact that you think this agency thinks this, but my responsibility is to decide this case according to the facts in law. And I disagree with the PTO's reading. Yes, as long as the patent still exists. If the end of the IPR proceeding is the cancellation of the relevant claim, then there isn't going to be something to be litigated about in district court. But otherwise, the claim construction that is adopted in along the way in getting to upholding the patent claim isn't going to bind the district court any more than the district court claim construction would bind a different district court or the PTO. Roberts, well, can it say that I understand what PTO thinks the scope of the patent is, but my responsibility is to interpret it pursuant to a different standard, and under my different standard, I have a different result? Yes, that could be the difference, and that is exactly what the courts have repeatedly recognized going back, as my friend noted, to the 1924 decision from the D.C. Circuit in the Carr case, which recognized that the PTO and the courts are using different standards precisely because you can still clarify the scope of the claim when you're before the PTO. So if the district court interprets the patent, is that binding on the PTO? No. And if the PTO interprets the patent, that's not binding on the district court? That's right. And the same thing is the same thing. I'm sorry. It just seems to me that that's a bizarre way to conduct a legal, decide a legal question. I mean, how does it work? Whoever gets to the judgment first, or? Well, with respect to the question of whether the patent still exists, if the PTO cancels the claims at the end of the proceeding, then there won't be something to be litigating about in district court. If the PTO holds that the burden of proving that this claim is unpatentable has not been satisfied, then somebody else can take another shot at that before the district court. This particular party who proceeded before the IPR won't be able to because they'll be stopped by Section 315 from pursuing the same arguments in both forums. Even though there are different standards of proof? Even though there are different standards of proof, they're going to. Is that how estoppel normally works? Here, Congress has expressly prescribed that you cannot use in the district court proceeding an argument that you reasonably could have advanced in the height of guilt. So the answer to my question is no, that's not the way estoppel normally works. That's right. But I would also say that in this context, the Court has recognized in blonder tongue that estoppel, that people can repeatedly relitigate the question of patent validity in district courts around the country. Is there another example where you have a complaint filed that puts an issue before the district court during which the parties can take that issue away from the district court and come up with an answer that then, well, I guess you're saying it doesn't bind the district court? I'm saying that if the PTO has the ability in the meantime to cancel the claim, to find that, yes, it is correct, this is one of those patents we never ought to have issued in the first instance, and that's true because when we've applied our broadest reasonable construction approach and the patent owner has proffered an amendment, they can't come up with something that is actually patentable. And that's because of their view. And then it goes back to the district court, and the district court said, well, thank you very much for your opinion, but my job is to give a different analysis. I'm not bound by this broadest possible reading. And when I read the patent, I think it comes out the other way, and that's how I'm going to decide this case. It is true that a district court, as long as the patent still exists and the district court has jurisdiction over the parties and the parties aren't precluded from raising those claims, it could end up at a different result at the end of the day, precisely because of the higher burden of proof and the fact that it has to adopt a saving construction that the PTO would not need to adopt. Roberts. And this is under a statute designed to make the patent system more reasonable and more expeditious in reaching judgment? Yes. And this is something where Congress has expressly delegated to the agency the authority to make regulations governing interparties review and set in 316b. How does that happen? How does this happen? I thought we send it back and the PTO says we shouldn't have issued it. If they say that, we cancel it. There is nothing in the district court, isn't that right? Yes. I mean, at that point, the patent owner can appeal to the Federal Circuit. The Federal Circuit may appeal the decision that the final written decision of the board is one that will say. And if they never issue a patent, I apply for a patent because I have this thing that instead of putting red cellophane on the speedometer, I put purple cellophane on the speedometer. It signals the presence of a hot dog stand. All right? I then try to patent it. And they look at his patent and say, no, absolutely not. Can I appeal to the court? I'm sorry. They don't issue a patent. I have an application. They don't issue a patent. Can I appeal their decision to the court? You would be able to, yes. And so here ultimately. I'm sorry, just to interrupt, but you're talking about something else. You mean appeal to the Federal Circuit, right? That he was talking about a patent application, yes. And also here there is going to be an appeal to the Federal Circuit of the substantive merits of the board's decision that this patent claim is unpatentable. It doesn't satisfy the standard. And so ultimately that's. I'm sorry. What I was asking, I think, is a different question. The reason it's not, it's not as if it's an appeal to the district court because the district, that's an issue before the district court. What is the scope of this patent? What does it cover? And the patent office is telling you, well, it covers this, and the district court says, thank you. I apply a different standard. I think it covers this. And when that's the case, it's a valid patent. That's correct. That could happen. But if the claim has already been canceled, the point is that if the, if the, if the Mr. Gannon, could you give an example? So far I'm halfway with you. If the PTO has canceled the patent, the lawsuit in the district court ends. There's nothing else for it to do. But let's assume that. Although the patent owner in the meantime could have appealed to the Federal Circuit and determined that the. Federal Circuit, and assuming it loses in the Federal Circuit, the district court case has ended, correct? Well, if the patent is gone, then they're not going to be litigating about it in district court. All right. So what does survive? Let's assume the patent office decides that the patent's still alive. The loser goes up to the Federal Circuit and the Federal Circuit says this is still a patent. They've given it a meaning of the broadest possible meaning and said it's still valid. Now what happens in the district court? What's still alive? Give a concrete example. What's going to happen with the district court or what can happen in the district court? In the context of the district court proceeding, I agree with the Chief Justice that the district court may still find some reason to think that if it's not applying the broadest reasonable construction approach, that it's going to end up in a different place and it's not going to be counted. How is it going to end up in a different place? Give me a concrete. I'm not sure. We think that at the margin, this can well make a difference. But that's Sotomayor Well, it can only make a difference for the district court finding the patent invalid, no? Gannon No. I don't expect that it would, because the problem here has to do, it's the overly broad readings that are going to result in having the patent be declared invalid with respect to prior art. What exactly the claim construction is could be relevant to other questions about whether it reads on the particular product that's at issue in the infringement action or whatever. And so there's a reason why the claim construction issue could still be a live one and why the district court would need to decide what it thinks the appropriate claim construction is. And it may not be found to adopt the patent in Muscatetio case. Sotomayor Before you, your time runs out, I do want to go back to the appealability issue. Assuming I start from the EEOC, the Mack Mining versus EEOC, which we don't easily think that Congress is intending to prevent courts from enforcing its directives to Federal agencies, okay? Number two, this is a very specific statute with steps about what, when and when not the PTO can institute one of these reviews. There's all sorts of provisions that say you can only do it under these circumstances and only after making these findings. Your position now is that that decision is never reviewable. Justice Ginsburg asked a very intelligent question, which is if we – what's the purpose of it outside the APA? And your opposing colleague says there's two purposes. It precludes mandamus, and it precludes reviews of the denial to grant such a hearing. Why isn't that, all of that, enough to say there should be some review? Why would Congress tell the PTO, don't do it except in these limited circumstances, but nobody's going to ever watch you to make sure that's what you're doing? Well, I'd say a couple things. First of all, calling something nonappealable would be a particularly odd way of saying that the only way to get review of this in the Federal circuit is through an appeal rather than through mandamus. And secondly, with respect to the question of whether this is just barring review of the decision not to institute a proceeding, we think that the contrast with the statute that applies to ex parte reexams is very telling here. And this is because in several provisions of the Patents Act, Congress has used the same phrase. They have called certain decisions by the PTO final and nonappealable. That's what they did here. But they made that applicable to a much broader category of decisions than it had previously done. But in the context of ex parte reexams in section 303C, which is reprinted on page 1A of the government's brief, they've made final and nonappealable only the following, the determination by the director that no substantial new question of patentability has been raised. And so that's a provision in which Congress did exactly what my friend says it was trying to do here. It said that the only thing that is final and nonappealable is the decision that no new question has been raised, and therefore, this proceeding will not be instituted. Here, the language of the Federal circuit's reading in Portola, where it basically had similar language and said it's appealable only at the end. We think – I'm not sure which case Your Honor is discussing, but we think that here the reading, the language, the scope of what Congress has made final and nonappealable is the entire decision whether to institute an inter partes review under this section. Ginsburg. Mr. Gannon, would you look at the reply brief at page 19, and they give a series of rulings that the Board might make that under your view would be immune from any judicial review. So the Board goes ahead and institutes an IPR, even though the requester for that IPR has already filed a parallel civil action, something the statute says should not happen. That would not be reviewable, that wrong decision, under your view of it. Is that? We think that they would not be subjects to an appeal. The court of appeals here left open the possibility of mandamus, and we understand why it did that, because the phrase here is nonappealable. That doesn't necessarily rule out mandamus. We don't think that it would make sense to have mandamus only at the end of the proceeding. We think that if mandamus were to happen, it should be the way it would normally happen at the time when the error, the alleged error occurs, but it would be only reserved for extraordinary circumstances. The party would go immediately to the Federal Circuit and say, we have a clear and indisputable entitlement to relief here because the agency is violating the statute. That's something where there would be expedited briefing, where the PTAB would not have invested all the resources into getting to a decision on the merits before a court pulled it back and said you never should have gotten there. So we do think that there may be circumstances that satisfy mandamus where there    Now, that's not the primary criteria, but what Congress has spoken to here and made nonappealable is the decision whether to institute proceedings under this section. That's not just the determination of whether there's a reasonable likelihood under subsection A, it's everything. And that section includes references to 311, to 313. It has a reference to decision under this chapter. And so all of that, we think, is included in the scope of the appeal bar, and that distinguishes it from a case like Mock Mining, where the presumption against reviewability had not been overcome, or the presumption in favor of reviewability had not been overcome. Here, Congress clearly spoke to that. Ginsburg, may I ask you a question that relates to the other issue? The district court holds that a patent is valid. Could the PTO, on its own initiative, then engage not in the inter-parties review, but reexamination? The district court says valid patent and PTO says we want to, on our own, have a reexamination. Yes. The reexamination can be instituted by the director at her own discretion or by other persons. And in that proceeding, the patent holder would be able to make any necessary proposed amendments that it wanted to make under 305, but the PTO wouldn't necessarily approve those amendments. It's not going to be an unfettered right to amend to protect the patentability. Ginsburg, so the district court decision wouldn't be preclusive, and the PTO has the last word. With respect to the ex parte proceeding, yes. Isn't that an appeal from the district court judgment to an administrative agency? It's not an appeal from the district court judgment. It's a separate proceeding before the agency that has ongoing authority to reexamine the validity of patents that has been issued, that it has issued. That's within statutory framework since 1980. So the district court reaches a judgment saying, you win based on my reading of the patent, and then you can go to the PTO and say, no, the reading of the patent of the district court was wrong, so you lose. Well, my understanding of Justice Ginsburg's hypothetical was that the director of the PTO could institute the reexamination proceeding in light of issues that were revealed for the first time in the district court proceeding. And then can the losing party in the district court go back to the district court, or if it's on appeal, to the court of appeals and say the district court was wrong, the PTO said that, and I should win? They could say that. If they already have a final judgment, then that's not going to be an issue. And depending on if the patent has not actually been invalidated, then they're going to still be using the district court claim construction in the judicial litigation. Thank you, counsel. Mr. Beeney, you have a minute left. Thank you, Mr. Chief Justice. Let me just begin by saying that as with the government's brief, we heard nothing today that suggests that the use of the ordinary claim construction would not accomplish Congress's purpose. But what we would avoid is all of the bizarre harms that are caused by the use of the broadest reasonable interpretation, expedient. We have different results, demonstrable different results, as the Chief Justice pointed out. Many of the cases are cited in our brief where a patent is upheld in the district court and then invalidated by the board. That wouldn't happen if we used the same claim construction as Congress intended by having a court-like system. We wouldn't be depriving patent owners of their property rights based on pretending the patent means something that it doesn't mean. Patent rights should be taken away only if the patent that's claimed, that was granted and that was issued, is unpatentable. And that, Justice Kennedy, is why we shouldn't have speculation in IPR. They're property rights and they should be treated as to what those property rights encompass. Putting together the government's position, the government says BRI is, quote, an examinational expedient used, quote, before the patent issues in, quote, an iterative process, quote, to promote clarity and precision in claims. That is not IPR. The government, the Congress in enacting IPR got rid of that examinational system. They got rid of it. Thank you very much. Roberts. Thank you, counsel. The case is submitted.